**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| **SYNETHIA BURROUGHS** | ) | |
| **Plaintiff,** | ) | |
|  | ) | |
| **vs.** | ) | **CIVIL ACTION NO. CV-05-715-KD** |
|  | ) | |
| **SMURFIT STONE CONTAINER CORPORATION, LP and WINSTON GODWIN** | ) | |
|  | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the following: defendant Smurfit Stone Container Corporation, L.P. ("Smurfit") motion for summary judgment (Doc. 36), brief in support (Doc. 37), statement of undisputed facts (Doc. 59) [1] and evidentiary material in support (Docs. 39-43); defendant Winston Godwin ("Godwin") motion for summary judgment (Doc. 44), statement of undisputed facts (Doc. 45), brief in support (Doc. 46) and evidentiary material in support (Docs. 47-56), plaintiff's brief in opposition to defendant Godwin's motion for summary judgment (Doc. 65) and evidentiary material in support (Doc. 66), plaintiff's amended brief in opposition

---

[1] On November 1, 2006 the undersigned entered an order striking defendant's proposed findings of fact and conclusions of law (Doc. 38) on the grounds that the voluminous document violated the spirit of the local rules as well as the Court's order granting defendant's motion to exceed the thirty (30) page limit for summary judgment briefs. (Doc. 57) Defendant Smurfit was granted leave to refile their findings of fact, which is docketed at Doc. 59.

1

to Smurfit's motion for summary judgment (Doc. 71) and evidentiary materials in support (Doc. 69) and defendant Smurfit's reply brief.  (Doc. 72)

I.     PROCEDURAL BACKGROUND

On December 13, 2005, plaintiff, Synethia Burroughs ("Burroughs"), filed suit against her former employer, Smurfit Stone Container Corporation, L.P. ("Smurfit"), alleging federal claims under Title VII based upon the actions of plaintiff's co-employee, defendant, Winston Godwin ("Godwin").  (Doc. 1) [2]  Count One of the complaint alleges that plaintiff was subjected to sexual harassment and hostile work environment.  Count Two alleges that plaintiff suffered retaliation by her employer for her complaints of discriminatory conduct.  The remainder of plaintiff's claims include state law claims of negligent training, supervision and retention of defendant Godwin (Count Three), assault and battery by defendant Godwin (Counts Four and Five), Invasion of Privacy (Count Six) and Intentional Infliction of Emotional Distress (Count Seven) [3], based on the actions of defendant Godwin.  (Doc. 1) Plaintiff has also named Godwin, individually, as a defendant in the state law claims.

Smurfit now seeks summary judgment as to all claims alleged against it in plaintiff's complaint on the grounds, in sum, that Burroughs' allegations of "sexual harassment" are not

_____

[2]  On May 12, 2006 plaintiff filed a motion to amend the complaint in order to correctly name the defendant Smurfit -Stone Container Enterprises, Inc., (previously named in the original complaint as Smurfit-Stone Container Corporation, LP).  (Doc. 17) Defendants lodged no objections, and the motion was granted on May 30, 2006.  (Doc. 18)

[3]  Plaintiff concedes that her claims of intentional infliction of emotional distress (outrage), invasion of privacy, and negligent training, supervision and retention are time barred and due to be dismissed.  (Doc. 70 at 62).  Accordingly, defendants' motions for summary judgment as to those claims are **GRANTED.**

actionable and, even if they were, Smurfit was not responsible for Godwin's actions.  Smurfit

further maintains that it did not terminate Burroughs' employment in retaliation of any

opposition by her to alleged harassment.  Godwin has filed a separate motion for summary

judgment on plaintiff's claims of assault, battery, invasion of privacy and intentional infliction of

emotional distress on the grounds, in sum, that the claims are barred by the applicable statute of

limitations. (Doc. 44)

II.    FACTUAL BACKGROUND [4]

Plaintiff, Synethia Burroughs, a thirty-three year old black female [5], was hired by

defendant Smurfit on or about March 17, 2003, as a utility person at defendant's container mill

in Brewton, Alabama.  (Doc. 69, Exhibit 1)  A utility person "floats" from assignment to

assignment, working any shift where needed.  (Doc. 69, Deposition of Winston Godwin,  p. 149;

Deposition of Dorothy Samuel, p. 137)   Job duties assigned to the Utility classification often

involve physically demanding, dirty, loud and potentially dangerous work.  (Doc. 69, Exhibit 54,

Deposition of Michael Wade , p. 2 )

Defendant, Winston Godwin, a white male, was employed by Smurfit from

approximately August 29, 1964, to February 29, 2004.  (Doc. 69, Exhibits 2, 3) During the times

relevant to this litigation, Godwin was employed as a "machine tender" on the No. 2 Paper

---

[4] As it is required to do when resolving a motion for summary judgment, the Court has construed the factual allegations in a light most favorable to the plaintiff.  Miller v. King, 384 F.3d 1248, 1258-59 (11th Cir.2004)(When ruling on a motion for summary judgment, the court "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party.")

[5] It does not appear that plaintiff has asserted a claim of racial discrimination in this lawsuit.

Machines and was a co-employee of plaintiff.  Godwin was retired from the company effective in March 1, 2004. (Doc. 69, Exhibit 32) [6]

Smurfit's Brewton mill currently employs approximately 575 workers of which approximately ten percent (10%) are women.  (Doc. 69, Wade Depo. at p. 257)

There are two paper machines in the Brewton Mill.  The No. 1 machines produces coated paperboard and the No. 2 Machine produces a two-part liner board product.  (Doc. 43, Exhibit 37, Affidavit of Michael D. Wade at 1)

All newly hired employees at Smurfit work on a "probationary" basis for ninety (90) days.  Pursuant to a collective bargaining agreement between Smurfit and the Union, during the 90 day probationary period the employee has no seniority rights and can be terminated by Smurfit without "recourse" to the grievance procedures under the agreement.  (Doc. 43, Wade Affidavit at ¶ 12)  Probationary status can be extended beyond 90 days by mutual agreement of Smurfit and the Union. (Id.)

Employees are given on the job training by co-employees and each employee works under the direction of a supervisor.  (Doc. 42,  Exhibit 34 Rowland Affidavit at ¶ 4)  Burroughs was initially assigned to supervisor Tony Cheatham.  Cheatham worked under the direction of manager Dan Rowland, the Superintendent of the No. 2 Paper Machine. (Id. at ¶ 1.) [7]

On May 9, 2003 Cheatham completed Burroughs' probationary performance review. [8]

_____

[6]  Godwin stated that he was given the option to retire or an investigation would be conducted surrounding an incident in which Godwin allegedly spit on a truck owned by Marvin Johnson.  (Doc. 69, Ex. 11  at 71-72)

[7]  Dan Rowland is currently serving as the paper mill superintendent.

[8]  The document reflects that the review was conducted on May 6, 2003 but was signed by Cheatam and Rowland on May 9, 2003.  (Doc. 69, Exhibit 12)

(Doc. 69, Exhibit 12) The review of Burroughs work performance was favorable.  (Id.)  Under the question "would you recommend this person for permanent employment?", the answer "yes" is checked.  (Id.)  Under the section entitled "Employee Comments" is the statement "[s]he says the machine is to [sic] hot for her."  (Id.)  The review also bears the signature of plaintiff Burroughs.  (Id.)  According to the document, Burroughs' 90 day probationary period was set to expire on June 16, 2003.  (Id.)

On May 12, 2003 Burroughs missed a safety training workshop. [9]

On June 2, 2003 Burroughs was transferred to the "A" shift to work under the supervision of Gary Darby.  (Doc. 43, Exhibit 37, Affidavit of Michael Wade, ¶ 25)  Based on comments from Cheatham and Darby regarding plaintiff's ability to handle the "heat issue", Rowland met with Burroughs on June 4, 2003 to discuss his concerns.  (Doc. 42, Exhibit 11, Rowland Affidavit at ¶ 18-23)  During the meeting, which was also attended by Darby and Assistant Superintendent Kevin Minnick, Rowland discussed with Burroughs her Performance Review, which stated that Burroughs had complained that "the machine is to[o] hot for her".  Rowland counseled  Burroughs regarding methods for preventing heat stress and plaintiff's responsibilities for reporting to her supervisor if she needed to leave the work area.  Burroughs told Rowland that she was"adjusting" to the heat and that she "understood the expectation" (Doc. 40, Exhibit 10, Deposition of Dan Rowland; Exhibit 20 Affidavit of Gary Darby  ¶ 14). [10]

_____

[9]  There is dispute surrounding the reason for Burrough's absence from the safety training class.  Burroughs now contends that she caught a virus from a co-worker and was simply ill that day and unable to come to work.  However, defendant contends that Burroughs told Cheatham she got overheated.

[10]  Rowland memorialized the meeting in a document dated June 4, 2003.  (Doc. 69, Exhibit 41)

Approximately one week before Burroughs' 90 day probationary period was scheduled to end, Darby allegedly told Rowland that he did not consider Burroughs' performance to be satisfactory and recommended that her employment be terminated. (Doc. 42 , Exhibit 20, Darby Affidavit at ¶ 18; Exhibit 34 Rowland, Affidavit at ¶ 24)  Between June 2, 2003 and June 13, 2003 Burroughs worked a total of nine (9) days on Gary Darby's shift.  (Doc. 69, Exhibit 40)

Rowland recalls, "The feedback I was getting from Gary [was] that she was struggling to accomplish tasks in a timely manner, namely, hauling up rolls . . . to the operating floor, which is a key task of utility on both machines, that she just was really having trouble keeping up with the required rate for that job . . . and she was – required constant supervision. She was not highly motivated [and would] leave assignments." (Doc. 40, Rowland Dep. at 35.) Rowland was also concerned that Burroughs appeared to be having problems with heat-related issues.[11] (Doc. 42, Rowland Affidavit at ¶ 25.)

Rowland believed that there were questions about Cheatham's supervision of plaintiff and whether he had provided her with sufficient feedback. (Doc. 42, Rowland Affidavit at ¶ 25.) As a result Rowland believed that, in fairness, "extending her probationary period was a better option than terminating or . . . giving her permanent employment." (Doc. 40, Rowland Dep. at 42.) Mike Wade, HR manager agreed. (Doc. 42, Rowland Affidavit at ¶ 27.)

On  June 13, 2003 Rowland, another manager (Jayson Davis), and the Union's Vice-President met with Burroughs, and told her that her progress during her probation period had not reached a satisfactory level of performance and that her orientation period would be

---

[11]  In her opposition brief, plaintiff now maintains that she never had heat related issues at the mill and any references regarding having "cramps" referred to menstrual cramps and not leg cramps.

extended. (Doc. 42, Rowland Affidavit at ¶ 27; Pl. Ans. to Interrog. 1.) Burroughs was told that her probationary period was extended because "we were concerned that we didn't have a good fit between her and the job" for the reasons discussed, including the heat-related incidents on May 14 and June 4, 2003. (Doc. 42, Rowland Affidavit. ¶ 28; Doc. 69 Exhibit 38) On June 13, 2003 Burroughs probationary period was formally extended "for a period of 90 days, through September 1, 2003."  (Doc. 69, Exhibit 37)

   *Sexual Harassment Training*

   Beginning in 1999 Smurfit disseminated EEO sexual harassment policies to all new employees and also to supervisors promoted since that time. (Doc. 69, Wade Dep., p. 32) In 2002, Smurfit provided training to managers and supervisors.  (Id. at 234-236) Smurfit has provided departmental training and general purpose training via posting notices periodically on the company wide bulletin boards. (Id. at 188-189.) Managers and supervisors training also included video and worksheet materials related to the anti-harassment policy.  (Id. at 238-239)

   Defendant Godwin stated that never received any training with regard to sexual harassment or race discrimination during his tenure at Smurfit.  (Doc.69,  Godwin Dep. p. 33.) Godwin also maintains that he never received any type of handbook from the company or any materials on policies or procedures or anything about discrimination. (Id. at 116)


   *Alleged Harassment* [12]

   One of Burroughs' job duties as utility person was to check the ice cooler in the control

---

   [12]  Defendant argues that plaintiff's account of this incident has changed over time.  In resolving the instant motion for summary judgment, the Court is relying on the version contained in plaintiff's opposition brief which is mirrored in her deposition testimony.

room. (Doc. 69 Exhibit 9, Deposition of Marvin Johnson, p. 134-135). Utility workers also take

their breaks in the control room. (Doc. 69, Exhibit 7 Deposition of Thomas Andrews, p. 86)  On

or about June 12, 2003, Godwin and Burroughs were working the same shift. (Doc. 69, Exhibit

12, Deposition of Winston Godwin, p. 146)  Burroughs entered the control room where Godwin

was operating the computers to check the ice cooler. (Doc. 71 at 32).  Plaintiff contends that

Godwin grabbed her arm unexpectedly causing her to almost fall between his legs. (Doc. 69,

Exhibit 13, Deposition of Synethia Burroughs, pp. 166-167)  Plaintiff further alleges that

Godwin told her that she was a pretty black girl and that he liked black and German women. (Id.

at pp. 266-267)  Godwin stated that he had stock in the company and would buy plaintiff a house

and a car. (Id. at  pp. 267-268)  Godwin stated he would give her any amount of money as long

as she would be good to him when he needed it. (Id. at pp. 269- 270)  Godwin further stated he

did not want plaintiff to tell anyone, because things would get out. (Id. at pp.277-278)  Godwin

also stated that he loved sex and plenty of it and as long as plaintiff did not pull her panties down

for anyone else, that he would be good to her. (Id. at 271) [13]

    On June 12, 2003, Burroughs told her co-workers Kenneth Floyd and Marvin Johnson [14]

---

[13]  Burroughs told Johnson about another incident where Godwin discussed his personal business.  Specifically, Godwin allegedly told Burroughs that he and his wife did not engage in sexual acts and he would like to get with her sometimes. (Doc. 69, Exhibit 53, Deposition of Marvin Johnson, pp. 39, 115.)

[14]  Marvin "Gator" Johnson, a black male has been employed with Smurfit for 23 years. (Doc. 69, Exhibit 20; Johnson Dep. at pp. 12, 14.)  He is a move-up supervisor or a set-up supervisor.  He is considered management on the days that he works that position.  (Doc. 69, Andrews Depo. at pp. 99-100; Samuel Dep. at p. 104-105.) Defendant acknowledges that Johnson sometimes worked as a "set-up supervisor," but contends that he was not working in that capacity on June 12, 2003. (Doc. 43, Wade Aff. ¶ 41.) "Set-up supervisors" are hourly-paid bargaining unit employees who are not supervisors, but are given temporary assignments to cover for supervisors who are absent. (Id.)

about the events in the control room, and asked them to tell Godwin to leave her alone.  (Id. at

192-195)  Johnson in turn, contacted Dorothy Samuel, EEO Liaison in Human Resources at

Smurfit and direct supervisor for the janitorial department for over eleven years. (Doc. 69,

Exhibit 34) [15]  Prior to her retirement in September 2006, Samuel worked for Smurfit for

approximately thirty three (33) years.  (Doc. 40, Exhibit 12 Deposition of Dorothy Samuel,

pp.12-13)  In Samuel's role as direct supervisor, she conducts investigations of those complaints

or grievances brought to her of a racial nature.  In the chain of command, Samuel reported to

Mike Wade.  (Id. at 15-17)

     Samuel interviewed plaintiff concerning the incident on June 12, 2003. Burroughs asked

Samuel not to say anything because the following Monday would mark the  end of her

probationary period.  (Doc. 69, Burroughs Dep., pp. 193-194)  Both Johnson and Samuel agreed

not to say anything. Samuel told Burroughs to "stay out of Godwin's way" until she (Samuel)

returned from her chemotherapy treatment on Monday.  (Doc. 69 Samuel Dep. at p. 115.)

     *The Investigation*

     On Monday, June 16, 2003 Samuel advised her manager, Mike Wade, of her discussions

with Burroughs and Johnson the preceding Thursday. Wade advised Samuel that her delay in

reporting the incident was contrary to her obligations as a HR representative and Smurfit's

Anti-Harassment Policy. (Doc. 43, Wade Affidavit ¶ 30; Samuel Aff. ¶ 9.)

     Wade, Rowland and Samuel met with Burroughs when she got off shift at 7:00 A.M.

on June 17, 2003. (Doc. 43, Wade Affidavit. ¶ 31; Complaint ¶ 14.)  Wade's notes of the

---

     [15]  Defendants maintain that Samuel is neither a supervisor nor a manager in Smurfit's
HR Department or in respect to human resources matters.

meeting reflect that plaintiff told them that on Monday, June 9, Godwin was staring at her and told her he would like a pretty young Black girl like her.[16] (Doc. 43, Wade Affidavit ¶ 33) Burroughs further told the group that on Thursday, June 12, Godwin had offered her money to have a sexual relationship with him. (Doc. 43,  Wade Affidavit ¶ 32; Rowland Affidavit. ¶ 36; Samuel Affidavit ¶ 11.)

Wade and Duanne Baggett, the Union's President, interviewed Godwin concerning Burroughs' allegations early in the morning on Thursday, June 19, 2003. Godwin admitted that he talked with Burroughs in the control room on June 12, but denied that he touched her or made any statement to Burroughs about sex. Godwin also denied making any gender-based statement to Burroughs on June 9.  (Doc. 43 Wade Affidavit ¶ 40.) Later in the day, Wade, Rowland and Baggett also met with Thomas Andrews, who stated that he had been working with Burroughs and Godwin on June 9, and that Godwin had told him that he thought that Burroughs was "pretty," but said that nothing else of a sexual nature was said. (Doc. 43, Wade Aff.idavit ¶¶ 41-42; Rowland Affidavit ¶ 41.) Based on that, Wade re-interviewed Godwin on Friday, June 20, and asked him whether he made any comment to Andrews on June 9 that he thought Burroughs was attractive or "pretty." Godwin insisted that he had not. (Doc 43, Wade Affidavit. ¶ 42.)

Wade, Rowland and Samuel also interviewed Johnson (Id. at ¶ 41), and Samuel "tried to interview all of the females that had worked" with or around Godwin. (Doc. 69, Samuel Dep. at 59)  Samuel maintains that the women told them  "if they had any encounters, they took care of

---

[16]  Burroughs has since recanted her assertions to Wade that Godwin made any statements of a sexual nature to her on June 9. (Doc. 69, Exhibit 13, Burrough's Dep., at 266-67) Rather, Burroughs now contends that the alleged statement by Godwin was made to Thomas Andrews, who then relayed it to Burroughs.

it . . . but they didn't give me any specifics . . . [but] whatever it was [it] didn't amount to anything to them." (Id. at 54-55.) [17]

On June 24, 2003, at the conclusion of a nearly two week investigation, Smurfit determined that Godwin engaged in a conversation with a co-worker of a sexually suggestive nature, and also, that Godwin did not provide accurate testimony during the investigation. (Doc. 69 Rowland Dep. at p. 86; Wade Dep. at pp. 49-50).[18] Godwin received a five day suspension for his actions against Burroughs.  (Doc. 66, Exhibit 5) Godwin was advised that if there was any further occurrence of a similar nature, his employment would be terminated.  (Id.)  In addition, even though Burroughs and Godwin already were assigned to different shifts, Rowland and Wade decided to transfer Burroughs to the No. 1 Paper Machine to make it less likely that there would be any contact between Godwin and Burroughs.   (Doc. 43,  Wade Affidavit ¶ 58; Rowland Affidavit ¶ 42.) [19]

*Extension of Probationary Period*

---

[17]  Indeed, it is undisputed that prior to Burrough's complaint there had been no formal complaints of a sexual nature made against Godwin. (Doc. 69, Godwin Dep, p. 97) Plaintiff has submitted in support of her opposition brief a memorandum dated December 19, 2000 signed by Mike Wade memorializing a meeting in November 2000 with Godwin regarding allegations that he made racially derogatory remarks to a co-employee.  (Doc. 69, Exhibit 24)  Plaintiff is not alleging racial discrimination in this action.

[18]  In response to questioning whether he disbelieved Godwin's version of events in the control room, Rowland responded: "we also had a witness that said he had a conversation with Winston that he totally denies every having.  So there was some evidence that something occurred in the control room.  To the extent of what it was, I guess I don't know that."  (Doc. 69, Exhibit 6, Rowland Dep., at 86)

[19]  Defendants also contend that Burroughs needed exposure to both paper machines and Rowland wanted to get another opinion on whether Burroughs' employment should be continued. (Doc. 43, Rowland Aff. ¶ 42; Wade Aff. ¶ 67.)

On June 13, 2003, a meeting was held to extend Burroughs' probation for a period of ninety (90) days.  (Doc. 43, Wade Affidavit) Burroughs was told that there were two reasons that her probation was being extended: 1) heat issues; and 2) leaving the floor. (Doc.  69,  Deposition of Thomas Miller,[20] pp. 30-31; Exhibit 6- Rowland Dep. at p. 32-47.) At the time of Burroughs' probation extension, Rowland told Burroughs that they did not feel that they "had done a good job of giving her feedback during her sixty-day (60) probationary period. (Doc. 69, Rowland Dep. pp. 39-40)  Rowland claims that the decision to extend Burroughs' probationary period was determined *prior* to her transfer to Darby's shift.  (Id. at p. 39)

On the same day that Godwin was suspended, June 24, 2003, Burroughs was assigned to work under the supervision of Glenn Grandison on the No. 1 Paper Machine. (Doc. 43, Wade Affidavit ¶ 67.)  This was the third supervisor to which plaintiff had been assigned during her tenure at the mill.  Grandison, a black male, has been employed with Smurfit for 25 years and became a supervisor in 2000. [21]  While Burroughs was working under Grandison's supervision, he was aware that she had made allegations of harassment against Godwin.  (Doc. 39, Exhibit 7,

---

[20]  Tommy Miller was union vice president during this time.

[21]  Defendants maintain that Grandison was viewed by management as "a very effective and capable supervisor...."  (Doc. 37 at 13) This view is shared by some of plaintiff's co-workers, however, others maintain that Grandison is one of the tougher supervisors to work under at the mill.  However, "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment.". McCaskill v. ConAgra Foods, Inc., 296 F.Supp.2d 1311 (M.D.Ala.,2003.); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

Deposition of Glenn Grandison, p. 43)[22] Plaintiff alleges that while she was under Grandison's supervision, he  assigned her additional duties which were not assigned to others who held the same job.[23]  (Doc. 19 at 5)

On August 1, 2003, after Burroughs had worked under his supervision for a little over a month, Grandison formally evaluated Burroughs' performance.  (Doc**.**, 42, Exhibit 36, Affidavit of Glenn Grandison  ¶ 13; Doc. 69, Exhibit 36) [24] In that performance review, Grandison noted that plaintiff's performance was unsatisfactory and indicated he would not recommend plaintiff for permanent employment.  (Doc. 69, Exhibit 36)  Grandison signed the review and passed it along to Rowland to discuss with plaintiff.  (Doc. 69, Exhibit 8 Deposition of Glenn Grandison pp. 52-54.) [25]

*Termination*

Approximately two weeks before her termination, plaintiff contends that Godwin "stood staring " at her while working in the basement.  (Doc. 19 at 6) Burroughs contends that she told Wade of the incident but he failed to do anything.[26]  Burroughs' employment was terminated on

---

[22]  Grandison testified in his deposition that he did not know plaintiff's allegations against Godwin were sexual only that he "heard it was harassment."  (Doc. 36, Exhibit 7 at 43)

[23]  Plaintiff does not identify the duties she maintains she was assigned that similarly situated employees were not.

[24]  In his affidavit Grandison maintains that plaintiff's performance was poor from the inception.  However, as plaintiff notes, there is no written documentation regarding Grandison's problems with plaintiff's job performance until the August 11, 2003 review.

[25]  The review, dated August 1, 2003 is signed by Grandison and Rowland.  The section entitled "Employee Comments" is blank as is the place for "employee signature."  (Doc. 69, Exhibit 36, p. 2)

[26]  Wade's affidavit acknowledges that Burroughs told him of the staring incident, however he maintains that Burroughs "told [him] on June 24, 2003 [the date Godwin was

August 1, 2003.  (Doc. 69, Exhibit 39) Burroughs filed this lawsuit on December 13, 2005.

(Doc. 1)

III.    SUMMARY JUDGMENT STANDARD

  Summary judgment should be granted only if "there is no issue as to any material fact

and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

party seeking summary judgment bears "the initial burden to show the district court, by reference

to materials on file, that there are no genuine issues of material fact that should be decided at

trial."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11ᵗʰ Cir. 1991).  Once the moving party

has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a

genuine issue of material fact.  Id.  "If the nonmoving party fails to makes 'a sufficient showing

on an essential element of her case with respect to which she has the burden of proof, 'the

moving party is entitled to summary judgment."  Id. (quoting Celotex Corp., v. Catrett, 477 U.S.

317 (1986))(footnote omitted).  "In reviewing whether the nonmoving party has met its burden,

the court must stop short of weighing the evidence and making a credibility determination of the

truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999

(11ᵗʰ Cir. 1992) (internal citations and quotations omitted).  However, the mere existence of any

factual dispute will not automatically necessitate denial of a motion for summary judgment;

---

suspended]that she had seen Mr. Godwin looking at her [and] this occurred prior to [the]
discipline of Mr. Godwin."  (Doc. 43, Wade Affidavit at ¶ 63) Wade maintains that as such he
did not believe this report warranted any response beyond the suspension and verbal warning
that any incidents of a similar nature would result in termination.  (Id.)  However, later in the
affidavit Wade maintains that Burroughs never reported to him that Godwin stared at her when
she was in the basement "washing up".  (Id. at ¶ 66)

rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v.

Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11ᵗʰ Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should be

seldom used in employment discrimination cases because they involve issues of motivation and

intent.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079 (11ᵗʰ Cir. 2004).  Rather, "the

summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to

be placed on either side of the scale."  Id. at 1086 (citation omitted).

IV.     DISCUSSION

      A.     Hostile Environment Claim [27]

          *Prima Facie Case*

Plaintiff alleges, in part, that defendant Smurfit "intentionally discriminated against

plaintiff on the basis of her gender...condoned and tolerated sexual harassment at its facilities

[and] Smurfit's actions created, nurtured, tolerated, condoned, and/or otherwise permitted a

sexually hostile environment in violation of Title VII of the Civil Rights Act of 1964, as

amended."  (Doc. 19 at 7)  Sexual harassment violates Title VII "[w]hen the workplace is

permeated with 'discriminatory intimidation, ridicule, and insult,' that it is 'sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment .'' ' Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295

(1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91

---

[27]  Although plaintiff mentions race in her complaint and alleges that the EEOC issued a
cause determination, plaintiff has not pursued a race discrimination theory in her opposition brief
and accordingly the court will only address the Title VII claim to the extent plaintiff is alleging
hostile environment sexual harassment.

L.Ed.2d 49 (1986)).

In order to establish a hostile work environment sexual harassment claim under Title VII an employee must show: "(1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir.1999)

Plaintiff, a black female, alleges that she was subjected to unwelcome sexual harassment by defendant Godwin, a co-employee.  (Doc. 19)  Defendant does not dispute that plaintiff's allegations in this regard are sufficient to meet the first, second and third prongs of the prima facie case.  Accordingly, the court will turn its' focus to the fourth of fifth elements of the test.

The determination of whether the alleged conduct is severe and pervasive, such that it altered the terms and conditions of plaintiff's employment, requires that the court engage in a two-pronged inquiry.  The first inquiry is whether the employee  "subjectively perceived" the harassing conduct as severe and pervasive.  Second, the employee's  perception must be objectively reasonable. Mendoza, 195 F.3d at 1246.  In evaluating the objective reasonableness of an employee's perception that conduct is severe and pervasive enough to alter the terms and conditions of employment, the Eleventh Circuit Court of Appeals has identified the following factors that should be considered:  "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive

utterance; and (4) whether the conduct unreasonably interferes with the employee's job

performance." Id.  Both the Supreme Court and the Eleventh Circuit Court of Appeals have held

that the severity and pervasiveness of "harassing conduct" is judged "under the totality of the

circumstances." Dar Dar v. Associated Outdoor Club, Inc., 2006 WL 3006704 at *2; 201

Fed.Appx. 718 (11th Cir., October 23, 2006) citing Mendoza, 195 F.3d at 1246.

In Mitchell v. Pope 189 Fed.Appx. 911 (11th Cir. , July 14, 2006) the plaintiff alleged:

> Plaintiff contends that Overbey: (1) tried to kiss her after the 1999 Sheriff's
> Department Christmas party and called her a "frigid bitch" when she refused, (2)
> showed up at places Plaintiff was "staking out" in December 1999 and told her
> "you must be working out" and "you sure do look fine," (3) appeared several
> times in her driveway in January 2000, once drunk, when he told Plaintiff's son
> that he loved Plaintiff, (4) suggested she wear certain jeans and commented "your
> ass sure does look fine," (5) told her "you can just walk into the room and I'd get
> an erection," (6) stood on his tiptoes to look down her shirt, (7) rubbed up against
> her, whispered in her ear, and put his arm across her chest, (8) chased her around
> the CID office, (9) once picked her up over his head in the CID office, (10) asked
> her over the Sheriff's Department telephones if she was dressed or naked, (11)
> opened the door to the women's bathroom and turned the lights off and on when
> Plaintiff was inside, (12) simulated "humping" another female employee with that
> employee's consent, (13) made sexually derogatory remarks and gestures about a
> female magistrate judge, and (14) referred to Sheriff Pope as a "big eared pencil
> dick motherfucker." In March 2000, Plaintiff and Overbey attended a conference
> in Alabama. Overbey told Plaintiff that the hotel had made a mistake and that they
> would have to share a room. Overbey slept on the floor. The next night, after
> Overbey got his own room, he tried to convince Plaintiff to go to the hotel hot tub
> with him and other conventioneers. He called her a "frigid bitch" when she
> refused; when she confronted him the next morning and threatened to tell the
> Sheriff if Overbey did not leave the conference, Overbey cried, promised he
> would be "good," and left. And Plaintiff explained that, in June 2002, before she
> was scheduled to work security at a private golf tournament given by a strip club
> owner, Overbey told her and other officers about another golf tournament hosted
> by this owner where strippers acted as caddies. Overbey said that the owner
> directed the strippers to place golf balls into their vaginas and to squirt them onto
> the green.

Id. at 914, n. 3 In concluding that plaintiff failed to present a prima facie case of hostile

environment sexual harassment the Court opined, in part:

Although Overbey's reprehensible behavior only can be described as crass and juvenile, we accept that this behavior-given its relative infrequency-is not the kind of "severe" harassment necessary for liability to attach under Title VII. Overbey's conduct is more comparable to the conduct in <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 584-86 (11th Cir. 2000), and in <u>Mendoza</u>, 195 F.3d at 1247, which we concluded was not objectively severe or pervasive. And no evidence exists that Overbey's behavior unreasonably interfered with Plaintiff's job performance. To the contrary, the evidence indicates that Plaintiff's health problems were the greatest hindrance to her job performance and led to her ultimate confrontation with Pope and her subsequent resignation. In short, Plaintiff has not shown a claim of actionable hostile work environment under Title VII.

<u>Id.</u>

Plaintiff maintains that the alleged harassment occurred numerous times, however, the evidence before the court, including plaintiff's complaint and deposition testimony, reflects the following four incidents:

*June 9, 2003*

During the investigation of her complaint plaintiff told Wade that Godwin had made offensive statements to her on June 9, 2003. However, in her deposition, Burroughs conceded that the statements were made *by* Godwin *to* Andrews, who then relayed them to plaintiff. (Doc. 69, Burroughs Dep., pp. 181-182) According to Burroughs, Godwin was "staring and looking" at her and "telling Thomas Andrews" that "he like[d] black womens and German womens . . . [t]hat they had heat to the body." (<u>Id.</u> at at 181) Defendant notes that plaintiff acknowledged that she had "no problem" with Godwin's telling her that she was a "pretty black girl" (<u>Id.</u> at 266-67) and did not take offense at his alleged statements that he "liked black and German women." (<u>Id.</u> at 268.)

*June 12, 2003 Incident*

Plaintiff further alleges that on June 12, 2003, she entered the control room where

Godwin was operating the computers.  Plaintiff alleges that Godwin grabbed her arm unexpectedly, causing her to *almost* fall between his legs.[28]  Plaintiff alleges that at this point Godwin told her that she was a pretty black girl and that he liked black and German women. Godwin also allegedly stated that he had stock in the company, would buy plaintiff a house and a car and that he would give her any amount of money as long as she would be good to him when he needed it; that he did not want plaintiff to tell anyone because things would get out; that he loved sex and plenty of it; that as long as she did not pull her panties down for anyone else that he would be good to her.  (Doc. 69, Exhibit 6 at pp. 271, 277-78; Godwin Dep., p. 185.)

*Baby, are you tired?*

Plaintiff also alleges that at some point after Godwin returned from suspension, she passed him in the clock alley and he made the following comment to her:  "Baby, are you tired?" Plaintiff maintains that in light of the fact that Godwin had just come off of suspension for his conduct toward her, she found this comment threatening.  However, Burroughs testified in her deposition that the referenced incident occurred during the investigation, before any discipline was imposed. (Doc. 69, Burroughs Dep., pp. 188-89)

*Staring Incident*

Plaintiff next alleges that after Godwin returned from his five day suspension he "stared at plaintiff in an intimidating way."  (Doc. 19)  Plaintiff advised Wade of the staring incident, but maintains that he took no action.

As to the comments relayed to plaintiff on June 9, 2003 from a third party, they "do not

---

[28]  In her complaint plaintiff alleged that she did in fact fall between Godwin's legs. However, in her responses to interrogatories, in her deposition and now in her opposition brief, plaintiff maintains that she "almost" lost her balance and "almost" fell between Godwin's legs.

carry the same weight as those made directly to the plaintiff." See Hudson v. Norfolk Southern

Railway Co., 209 F. Supp. 2d 1301, 1314, n. 16 (N.D. Ga. 2001).  Under the law of this circuit

Godwin's alleged comments to a third party are not actionable harassment.  The comment "baby,

are you tired" also fails to reach any threshold of actionable harassment.  Likewise, plaintiff's

allegations that Godwin stared at her are not actionable.  See Mendoza, 195 F.3d at 1247-48.

In Mendoza, the Eleventh Circuit Court of Appeals opined, in part:

> [A]lthough "following and staring" can betray romantic or sexual attraction, the
> everyday observation of fellow employees in the workplace is also a natural and
> unavoidable occurrence when people work together in close quarters or when a
> supervisor keeps an eye on employees. For example, Mendoza described Page's
> constant "following and staring" as "he always seemed to be wherever I was. If I
> was in the lunch room, he was there. If I was at a picnic table outside on a break,
> he was there." Nevertheless, because we conclude that the conduct established by
> Mendoza was not sufficiently severe or pervasive to alter Mendoza's terms or
> conditions of employment, we assume, but do not decide, that this conduct is
> sexual in nature and thus might implicate sex discrimination.

195 F.3d. at 1248.

The June 12, 2003 incident, while shameful, is also not actionable.  While the Court

agrees that Godwin's comments were offensive in nature, it is well settled in this circuit that not

all such crude behavior constitutes actionable sexual harassment.  See Gillis v. Georgia Dept. of

Corrections, 400 F.3d 883, 888 (11th Cir.2005) (recognizing that Title VII is "neither a general

civility code nor a statute making actionable the ordinary tribulations of the workplace").

Moreover, the Eleventh Circuit has held that similar conduct was not sufficient to constitute

sexual harassment.  See Mendoza, 195 F. 3d at 1247-48 ; Gupta v. Florida Bd. of Regents, 212

F.3d 571, 584-86 (11th Cir. 2000).

In Mendoza, the alleged harasser told plaintiff that he was "getting fired up," rubbed his

hip against the plaintiff's hip while touching her shoulder and smiling, twice made a sniffing

sound while looking at the plaintiff's groin area and once made a sniffing sound without looking at her groin, and constantly followed and stared at plaintiff in a "very obvious fashion." 195 F.3d at 1247.  Similarly, in Gupta, the alleged harasser suggested lunch at Hooters, told the plaintiff that she was  "looking very beautiful," called the plaintiff at her  home, unbuckled his pants and tucked in his shirt in front of her, stared at her twice, touched her ring and kept asking her to lunch, placed his hand on her knee, and touched the hem of her dress. 212 F.3d at 584-86.  In each of these cases the Eleventh Circuit concluded that the allegations were insufficient to state a prima facie case of harassment.  Specifically, the court determined that the conduct about which plaintiff complained was not severe and pervasive such that it altered the terms and conditions of employment.

Taking all plaintiff's allegations as true and looking at the incidents *in toto* as to the frequency, the severity, whether they were physically threatening and whether the conduct unreasonably interfered with plaintiff's job performance, the Court finds that the allegations do not rise to the level of actionable sexual harassment.  The alleged conduct occurred over a four to five week period.  Although the June 12, 2003 incident involved a physical touching in that Godwin grabbed plaintiff by the arm,  the conduct was not severe and pervasive such that plaintiff's conditions of employment were altered.  In the last analysis, plaintiff has failed to show that the incidents about which she complains were severe and pervasive such that they altered the terms and conditions of her employment.  Accordingly, defendant Smurfit's motion for summary judgment on plaintiff's hostile environment sexual harassment claim is **GRANTED.**

Even if the Court were to conclude that plaintiff's claims of harassment were severe and

pervasive, plaintiff's claim must still fail as Smurfit's response was appropriate and reasonable. Plaintiff argues that defendant Smurfit is liable for the hostile environment sexual harassment created by Godwin.  Where, as is true in the present case, the perpetrator of the harassment is a co-employee of the victim, the employer will be held directly liable only if it knew, or should have known, of the harassing conduct and failed to take remedial action. Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000).  To be appropriate, "[t]he 'remedial action' must be reasonably likely to prevent the misconduct from recurring." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir.1996).

A plaintiff can demonstrate the employer knew of the harassment "by showing that she complained to higher management of the harassment," or by demonstrating the "pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." Id.; Durham v. Philippou, 968 F.Supp. 648, 655 (M.D. Ala. 1997) (quoting Huddleston v. Roger Dean Chevrolet, Inc., 845 F.2d 900, 904 (11th Cir. 1988)).

It is undisputed that there were no prior complaints of sexual harassment against Godwin prior to those lodged by plaintiff in mid June 2003.  Rather, the evidence before the court reflects that only during the investigation of plaintiff's complaint did Smurfit become aware that three (3) other women maintained that Godwin had made inappropriate sexual remarks to them in the past.  It is further undisputed that none of these women complained to management about these alleged incidents.

Plaintiff attempts to impute knowledge of Godwin's conduct (or propensity for such conduct) to Smurfit by arguing the company should have been on notice of Godwin's alleged behavior through the 'rumor mill" in the small plant.  However, rumor and innuendo are

insufficient as a matter of law to establish the constructive knowledge necessary to impose

liability on an employer.

The record reflects that upon notification to management of the allegations, Smurfit

conducted an investigation into plaintiff's complaints, interviewed witnesses, warned Godwin of

the consequences of any further incidents and placed him on a five day suspension.[29]  (Doc. 66,

Exhibit 5)  While it is abundantly clear that plaintiff disagreed with the disciplinary sanctions

imposed on Godwin, the evidence before the Court reflects that Godwin had been at the mill for

nearly forty (40) years and no formal complaints of sexual harassment had been previously made

against him.  Thus, the five day suspension, and moving plaintiff to another shift to ensure that

the two had no further contact, was reasonable under the circumstances.  Accordingly,

defendant, Smurfit, is entitled to summary judgment on plaintiff's sexual harassment claim.

B.      Retaliation [30]

---

[29]  Defendant also raises the issue of plaintiff's failure to follow policy regarding making her complaint.  Breda, 222 F.3d at 899 (reiterating that in this circuit "if an employer has a company policy specifically designating the person or persons to whom an employee should report instances of suspected sexual harassment, once the employee complains to the designated person or persons, the employer is deemed to have actual notice of the harassment") (citing Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir.1999)).  Specifically, defendant notes that plaintiff reported the incident to co-employees and did not follow company procedure.  Defendants further maintain that Johnson's reporting to Samuel's did not cure the error since Samuel's was not the designated to handle such complaints.  However, Samuel stated in her deposition in her role as direct supervisor, she was charged with conducting investigations of complaints or grievances brought to her of a racial nature.  Although the document is not in evidence, plaintiff states that her EEOC charge alleged both racial discrimination and sexual discrimination.  For the purposes of resolving the instant motion for summary judgment, the court assumes that Samuel was a person designated to receive plaintiff's complaint.

[30]  Title VII makes it unlawful for an employee to discriminate against an employee in retaliation for opposing a practice made an unlawful employment practice under Title VII . 42 U.S.C. § 2000e-3(a). "To recover for retaliation, the plaintiff need not prove the underlying claim of discrimination which led to [his] protest, so long as [he] had a reasonable good faith

Plaintiff next alleges that "SSCE [Smurfit] intentionally and willfully discriminated against plaintiff in retaliation for her prior complaints of discriminatory behavior" and terminated her employment "in retaliation for opposing sexual harassment."  (Doc. 19 at 8-9)

To establish a prima facie case of retaliation under Title VII, a plaintiff must prove (1) that she participated in statutorily protected activity, (2) that she suffered an adverse action, and (3) that there is a causal connection between the participation in the protected activity and the adverse decision. Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir.2002); see also Gupta, 212 F.3d at 587.  "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct [and] that the protected activity and the adverse employment action were not wholly unrelated." Id. at 590 (internal quotations and citation omitted). If the plaintiff establishes a prima facie case, the burden "shifts to the defendant to articulate a legitimate reason for the adverse action." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir.2006)  "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." Id.[31]

_____

belief that the discrimination existed." Gupta, 212 F.3d at 586.

[31]  Plaintiff argues that Grandison's comments that he had to keep the big guys upstairs off his ass is direct evidence of retaliatory intent. (Amended Complaint at ¶ 17) "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination. If the alleged statement suggests, but does not prove, a discriminatory motive, then it is considered circumstantial evidence." Akouri v. Fla. Dep't of Transp., 408 F.3d 1338, 1347 (11th Cir.2005) (quoting Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir.1997); Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) ("[D]irect evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor. If an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence.) Accordingly, the court will apply the traditional McDonnell Douglas-Burdine burden-shifting analysis to plaintiff's retaliation claim. Johnson v. Booker T. Washington Broad. Serv. Inc., 234 F.3d 501, 511 n. 10 (11th Cir.2000).

Smurfit first argues that plaintiff's allegations against Godwin were not protected opposition.  (Doc. 37 at 31)  In order for Burroughs' allegations against Godwin to be protected "opposition," she must demonstrate a good-faith, reasonable basis for believing that the underlying, allegedly discriminatory practices which she opposed constituted a violation of Title VII.  Little v. United Technologies, 103 F.3d 956, 960 (11th Cir. 1997).  This component includes both a subjective and objective belief.  First, Burroughs must show that she, in good faith, believed that defendant was engaged in unlawful employment practices.  Secondly, she must show that this belief was objectively reasonable in light of the facts and records presented.  Id.

The evidence reflects that Burroughs spoke with Dorothy Samuel regarding Godwin's alleged sexual harassment and that Smurfit conducted an internal investigation into the allegations.  As a result, Smurfit suspended defendant Godwin for a five day period.  Based on this evidence the Court finds that plaintiff has met the first prong in that her allegations of sexual harassment constitute protected opposition.

Defendants do not dispute that plaintiff suffered an adverse employment action as a result of her termination.[32]  Thus, the Court next turns to the causal connection element. Burroughs alleges that "the timing of the termination in connection with [her] complaints""raised a genuine

---

[32] Plaintiff makes no argument in her response to summary judgment that she suffered an adverse employment action based on the extension of her probation.  Thus, plaintiff has conceded the issue of the extension of her probationary period and therefore the Court limits its discussion to whether plaintiff was terminated in retaliation for complaining of sexual harassment by Godwin.

issue of material fact" as to her allegations of retaliation. (Doc. 70 at  61.)

Defendant argues that there is no causal connection between any protected conduct and the termination of plaintiff's employment.  Specifically, defendant contends that Rowland's earlier concerns about Burroughs' performance and fitness issues were confirmed by Darby's observations and recommendation that she be terminated, but also by Grandison's observations and recommendations to the same effect.  (Doc. 72 )  Defendant argues that temporal proximity raises no inference of causation when a plaintiff has had a history of performance deficiencies.

To establish a causal connection, Burroughs must show that: (a) the decision-makers were aware of the protected conduct; and (b) the protected activity and the adverse employment action were not wholly unrelated. Gupta, 212 F. 3d at 590 (citations omitted). However, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision-maker did not have knowledge that the employee engaged in protected conduct." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir.2000) (citation omitted), cert. denied, 532 U.S. 1037, 121 S. Ct. 1998, 149 L.Ed. 2d 1001 (2001).

Recently, in Gary v. Hale, 2007 WL 5812 (11th Cir., January 3, 2007) (slip opinion)the Eleventh Circuit reiterated its position that the requirement of causation in a retaliation case be interpreted broadly.  The Court opined, in pertinent part:

> Finally, with respect to the third element-causation-a plaintiff is required to establish a causal connection between the plaintiff's engagement in a protected activity and the adverse employment action. See, e.g., Meeks at 1021 (stating that the plaintiff must show "some causal relation between the two events"). We have indicated that the requirement of causation in a retaliation case is to be interpreted broadly; that is, the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." Id. (citations and internal quotation omitted). More important, and more germane to this case, we

26

have repeatedly indicated that a plaintiff may satisfy the causal link in a retaliation case by establishing that "the employer was actually aware of the protected expression at the time it took the adverse employment action." <u>Clover</u> 176 F.3d at 1354; <u>Raney v. Vinson Guard Serv</u>., 120 F.3d 1192, 1197 (11th Cir.1997). That is, the causation threshold may be satisfied if it can be shown "that the person taking the adverse action was aware of the protected expression." <u>Bass,</u> 256 F.3d at 1119. Such awareness may be established either by direct evidence, or by circumstantial evidence, <u>Clover,</u> 176 F.3d at 1354, such as proximity in time. <u>Bechtel Constr. Co. v. Sec'y of Labor</u>, 50 F.3d 926, 934 (11th Cir.1995).

<u>Id.</u> at *4.

The evidence reflects that Burroughs was terminated approximately six weeks after reporting that she had been subjected to sexual harassment by defendant Godwin.  In addition, her last supervisor, Glenn Grandison, who recommended her termination, stated that he was aware of her harassment complaint at the time he made the recommendation.  Based on this evidence, coupled with the Eleventh Circuit's position that causation in a retaliation case be interpreted  broadly, the Court finds that plaintiff has satisfied this final element and thus has established a prima facie case of retaliation.  The Court next turns to defendant's legitimate non-discriminatory reason for its actions.

Defendant contends that plaintiff was terminated for poor job performance.  Specifically, defendant maintains that "SSCE [Smurfit] has presented evidence that Burroughs' two supervisors during the final two months of her employment found significant performance and suitability shortcomings and recommended that she not be retained."  (Doc. 37 at 38)  Under <u>McDonnell-Douglas</u>, defendant's burden is one of production, not of persuasion, thus, as defendant has articulated a legitimate non-discriminatory reason for its action, the burden now shifts to the plaintiff to establish that the articulated reason is pretextual for discriminatory conduct.

In order to establish pretext, Burroughs must offer evidence (1) that Smurfit's proffered reason for her termination has no basis in fact, (2) that the proffered reason did not actually motivate the employment decision, or (3) that the alleged reason was insufficient to motivate the employment decision. See  Holston v. The Sports Auth., Inc., 136 F.Supp.2d 1319, 1338 (N.D.Ga.2000), aff'd 251 F. 3d 164 (11th Cir. 2001).  See Chapman v. AI Transport, 229 F.3d 1012 (11th Cir.2000) (requiring plaintiff to rebut each nondiscriminatory reason, where there are multiple reasons asserted, in order to avoid summary judgment); Cuddeback v. Florida Bd. of Educ. 381 F.3d 1230, 1235 (11th Cir.2004)(Summary judgment in favor of the employer is only proper where the plaintiff does not offer sufficient evidence to establish a genuine issue of material fact as to whether the employer's reasons were pretextual.)  If the given reason is one that may motivate a reasonable employer, the plaintiff cannot succeed simply by quarreling with the wisdom of that reason.  Chapman, 229 F.3d at 1030.

In Jones v. U.S. Department of Veteran's Affairs, 2007 WL 106776 (11th Cir., January 17, 2007) (slip opinion), the Eleventh Circuit Court of Appeals opined, in pertinent part:

> The plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir.1989) (quotation marks and citation omitted). The court's only concern is the honesty of the employer's explanation, even if the employer was mistaken about the facts underlying those reasons. See Cooper v. Southern Co., 390 F.3d 695, 730 (11th Cir.2001). To survive a motion for summary judgment, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons ... that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997) (citation and internal quotation marks omitted).

Id. at *2.

Burroughs contends that when she was transferred to a different supervisor and after she

complained of sexual harassment, she was set up by Smurfit to fail. Specifically, Burroughs maintains that she was placed under supervisors who had a reputation of being harder on employees and was assigned tasks that similarly situated employees had not been required to perform.[33]  (Doc. 71 at 60-61)  Plaintiff also points to the comment made by Grandison in response to an inquiry by other employees of why Grandison was so hard on plaintiff. Grandison allegedly replied that he had to "keep the guys upstairs off his ass".  This comment could possibly be interpreted as evidence of an effort by Grandison to appease management by retaliating against Plaintiff.  Plaintiff also notes that her employment was terminated "50 days after Mr. Godwin's conduct was reported, and 84 days after she was given an evaluation [by supervisor Cheatham] recommending that she be hired permanently". (Id. at 63)  However, the most compelling evidence supporting plaintiff's argument of pre-text is the dramatic difference in plaintiff's evaluations before and after the plaintiff made her sexual harassment complaint against Godwin.  The favorable evaluation was only six weeks before plaintiff lodged her sexual harassment complaint.  While defendant has submitted evidence explaining the reasons for the different evaluations, the court finds that plaintiff has submitted sufficient evidence to show the existence of a genuine issue of material fact regarding the defendant's motivation for terminating the plaintiff.

For the first time, in its' reply brief , Smurfit  argues that even if Burroughs can establish that an impermissible factor played a motivating part in her termination, it cannot be held liable because  "it would have made the same decision even if it had not taken the [impermissible factor] into account." In analyzing a  retaliation claim where defendant asserts a mixed motive

---

[33]  Plaintiff does not identify in her brief what these tasks were.

defense, the court must engage in a two part inquiry. First, the court must determine, as it has done *supra*, that Burroughs has established that a genuine issue of fact remains regarding whether an impermissible factor, i.e. retaliation, motivated defendant's decision to terminate her employment.  The second inquiry focuses on whether Smurfit has shown that no genuine issue of material fact exists regarding the claim that Smurfit would have taken the same adverse employment action even in the absence of the impermissible factor.  Price Waterhouse v. Hopkins, 490 U.S. 228, 252-53 (1989); Pennington v. City of Huntsville, 261 F.3d 1262, 1269 (11th Cir.2001); McShane v. U.S. Attorney, 144 Fed. Appx. 779, 793, n. 18 (11th Cir. 2005).

Smurfit primarily relies on the Burroughs' supervisors' comments regarding her poor work performance to show the absence of a genuine issue of fact.  Smurfit has also provided the Court with "statistical and comparative evidence" in further support of its position that plaintiff was fired because of performance.  Specifically, defendant identifies two white males, Phillip Purnell and Earl Cook, who were employed as Utilities.  Defendant argues that both men had their probationary periods extended and were ultimately terminated " even though there was no evidence that their performance was 'poor'."  (Doc. 72)

Resolving all inferences in favor on plaintiff, the court finds that Burroughs has established that a genuine issue of fact remains regarding whether an impermissible factor, i.e. retaliation, motivated defendant's decision to terminate her employment.  Moreover, Smurfit has not shown that no genuine issue of material fact exists regarding the claim that Smurfit would have taken the same adverse employment action even in the absence of the impermissible factor.  Accordingly, defendant Smurfit's motion for summary judgment on plaintiff's claim of retaliation is **DENIED.**

C.      State Law Claims

*Assault and Battery*

Plaintiff has also alleged state law claims of assault (Count IV) and battery (Count V) against defendant Godwin, individually, and as an agent for Smurfit. Both defendants move the court for summary judgment on the grounds, in sum, that the claims are barred by the applicable statute of limitations.

In order to prove an assault-and-battery claim, the plaintiff must establish the following: "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." Harper v. Winston County, 892 So.2d 346, 353 (Ala.2004); Ex parte Atmore Community Hosp., 719 So.2d 1190, 1194 (Ala.1998). "A successful assault becomes a battery, which consists of the touching of another in a hostile manner." Wright v. Wright, 654 So.2d 542, 544 (Ala.1995), citing, Surrency v. Harbison, 489 So.2d 1097, 1104 (Ala.1986), and Singer Sewing Machine Co. v. Methvin, 184 Ala. 554, 561, 63 So. 997, 1000 (1913). A key element of the tort of battery is that "the touching was conducted in a harmful or offensive manner." Atmore Community Hosp., 719 So.2d at 1194. The Alabama Supreme Court noted that, in order to establish that the defendant committed a battery, there must be substantial evidence that the alleged touching occurred with sexual overtones and was unwelcome. ( Id.).

The incident made the basis of plaintiff's assault claim allegedly occurred on or about June 12, 2003.  Specifically, plaintiff alleges that Godwin grabbed her arm causing her to almost fall between his legs.  Plaintiff filed the instant complaint on December 13, 2005, more than two years after the alleged incident occurred.

31

Defendant Smurfit maintains that the proper limitations period is two years as provided under Ala.Code 1975, § 6-2-38(n).  This section provides that "[a]ll actions commenced to recover damages for injury to the person or property of another wherein a principal or master is sought to be held liable for the act or conduct of his agent, servant, or employee under the doctrine of respondeat superior must be brought within two years."  <u>Id.</u>  To the contrary, plaintiff maintains that the claims are governed by a six year limitations period as set out in Ala. Code 1975, § 6-2-34(1).  This section provides in part that "[t]he following must be commenced within six years:(1) Actions for any trespass to person or liberty, such as false imprisonment or assault and battery..."  <u>Id.</u>

"[T]he two-year limitation of § 6-2-38(n) applies to bar a plaintiff's claims against an employer based upon the intentional torts of the employer's servants, unless the plaintiff's "allegations and proof show" that the defendant employer directed, aided, participated in, or ratified the alleged tortious conduct of the servant."  <u>Wint v. Alabama Eye & Tissue Bank</u> 675 So.2d 383, 386 (Ala. 1996).   The plaintiff states that Smurfit ratified Godwin's conduct of assault and battery.   However, the evidence is insufficient to support this assertion.  Accordingly, the court concludes that claims of assault and battery against Smurfit is time-barred because it was not brought within two years from June 12, 2003, the date of the incident upon which plaintiff bases her assault and battery claims.  Accordingly, Smurfit's motion for summary judgment as to plaintiff's claim of assault and battery is **GRANTED**.

Defendant Godwin also requests summary judgment on plaintiff's claim against him for assault and battery alleging that the claim is outside the statute of limitations.  Under Alabama law, "[a]n action alleging assault and battery must be brought within six years after the accrual

of the cause of action. §6-2-34(1), Ala. Code 1975." Travis v. Ziter, 681 So.2d 1348, 1351 fn. 1 (Ala. 1996).[34]   Accordingly, the plaintiff's claim of assault and battery against Godwin is not barred by the statute of limitations, as she filed her claim within the six years from the incident.

     Defendant Godwin also argues that summary judgment is due to granted because "the events of the June 12, 2003 incident as described by Plaintiff are wholly untrustworthy and incredible."   As stated *supra*, the court cannot weigh the evidence and make a credibility determination of the truth of the matter.  Tipton, 965 F.2d  at 999.  Where the plaintiff has produced sufficient evidence, as plaintiff has in this case, of the existence of a genuine issue of material fact, summary judgment must be denied.

V.    CONCLUSION

     Based on the foregoing, defendant Smurfit's motion for summary judgment is **GRANTED** on plaintiff's claims of hostile environment sexual harassment and assault and battery and **DENIED** as to plaintiff's claim of retaliation.  Defendant Godwin's motion for summary judgment on plaintiff's claims alleging assault and battery is **DENIED.**

     **DONE** this the 12th  day of March, 2007.

      **s/ Kristi K. DuBose**
     **KRISTI K. DuBOSE**
     **UNITED STATES DISTRICT JUDGE**

---

[34]The court cannot reconcile the seemingly inconsistent cite to Ala. Code 1975, §6-2-38(l)(providing for a two year SOL) in Wright v. Wright, 654 So.2d 542, 544(Ala. 1995) for support that the statute of limitations had run on the assault and battery claim.  However, the court notes that in Wright the court did not specifically state that the assault and battery statute of limitations was two years (thirteen years had lapsed), rather it simply cited to the two year statute.  Id.